**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| YEDA RESEARCH AND | ) |
| DEVELOPMENT CO., LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 10-1836 (RMC) |
| | ) |
| ABBOTT GMBH & CO. KG, | )   ~~UNDER SEAL~~ |
| | ) |
| Defendant. | ) |

_____

**OPINION**

The parties in this patent case dispute which was the first to purify and isolate a protein called TBP-II. Working independently in two different countries, Yeda and Abbott filed patent applications just nine days apart in 1989. Twenty-four years later, litigation continues over which has priority to the United States patent for the protein, with each party having won and lost battles along the way. Abbott was granted the U.S. patent in 2000. However, Yeda succeeded in invalidating Abbott's patent in administrative proceedings before the United States Patent and Trademark Office in 2000. Another judge of this Court vacated that ruling, found for Abbott, and sent the case back to the Patent and Trademark Office. Abbott prevailed on remand in 2010, and the case returned to this Court with Yeda as plaintiff. The parties recently finished discovery.

As a final precursor to briefing on summary judgment, scheduled for this summer, Abbott has asked the Court to compel Yeda to produce materials that, according to Abbott, Yeda should have turned over in discovery. Abbott's request can be broken generally into two categories: (1) documents related to 2003 experiments, attended by Yeda representatives, that

Abbott conducted to replicate the 1989 experiments that led to Abbott's original German patent application, and (2) the royalty agreement that Dr. Engelmann (one of Yeda's inventors and Yeda's testifying expert) has with other Yeda inventors. The former category presents potentially complex legal issues implicating Dr. Engelmann's multiple roles over the long history of this case; the latter category is a much simpler debate. The Court heard oral argument on June 5, 2013, and, for the reasons set forth below, Abbott's motion to compel will be granted as to its request for documents related to the 2003 experiments and denied as to its effort to obtain the royalty agreement.

## I. BACKGROUND

The facts of this case and its procedural history are set forth in detail in prior opinions of this Court and the United States Court of Appeals for the Federal Circuit. *See Abbott GmbH & Co., KG v. Yeda Research & Dev. Co.* ("*Abbott I*"), Civ. No. 00-1720 (RMU), Memo. Op. (D.D.C. filed June 13, 2005) (denying Yeda's motion for summary judgment); *Abbott GmbH & Co., KG v. Yeda Research & Dev. Co.* ("*Abbott II*"), 516 F. Supp. 2d 1 (D.D.C. 2007) (construing U.S. Patent 5,344,915 ("915 Patent," sometimes referred to as the "LeMaire patent")); *Abbott GmbH & Co., KG v. Yeda Research & Dev. Co.* ("*Abbott III*"), 576 F. Supp. 2d 44 (D.D.C. 2008) (granting Abbott's motion for summary judgment); *Abbott GmbH & Co., KG v. Yeda Research & Dev. Co.* ("*Abbott IV*"), 333 F. App'x 524 (Fed. Cir. 2009) (dismissing Yeda's appeal for lack of jurisdiction); *Abbott GmbH & Co., KG v. Yeda Research & Dev. Co.*, 415 F. App'x 257 (Fed. Cir. 2011) (dismissing Yeda's second appeal for lack of jurisdiction). The background of the case is repeated here only as necessary to resolve Abbott's motion to compel.

### A.  Parties' Competing Patent Claims and Procedural History

Plaintiff Yeda Research & Development Co., Ltd. ("Yeda") is an Israeli company; Abbott GmbH & Co. KG ("Abbott") is a German subsidiary of Abbott Laboratories, Inc., which is based in Illinois.   Compl. [Dkt. 1] ¶¶ 3, 6–7.

At issue in this case is the parties' dispute as to which was the first to isolate, purify, and identify a protein[1] called Tumor Necrosis Factor Binding Protein-II ("TBP-II"). TBP-II "is isolated from the urine of individuals with a fever and from the ascites fluid of individuals with ovarian carcinomas."  *Abbott III*, 576 F. Supp. 2d at 46.  TBP-II "binds to, and thereby neutralizes, potentially harmful polypeptides."  *Id.* at 45.  The record does not reveal how the discovery of TBP-II has been significant medically, ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ *See* Yeda Br. Supp. Opp. Abbott Mot. Compel ("Yeda 1st Opp.") [Dkt. 54], Ex. J [Dkt. 58-1] (Engelmann April 15, 2013 Dep.) at 14; ████ ████████████████████████████████████████████████████████████████ ██████  Under patent law then in effect,[2] the "first person to conceive the invention is the first inventor, . . . provided that when the first to conceive the invention is the last to reduce it to practice, the person who was first to conceive must have exercised reasonable diligence to his own actual or constructive reduction to practice, 'from a time prior to conception by the other.'"

---

[1] "[P]roteins are long chains of amino acids like beads on a string.  . . . The chain begins at the N-terminus, the location of an amino group to which all other amino acids are sequentially attached.  . . . Because a protein can be made up of a very long sequence of amino acids, scientists identify each protein by listing the sequence of amino acids beginning at the N-terminus. . . . [T]he [915 P]atent describes the TBP-II protein by listing 22 of the amino acids located at the N-terminus."  *Abbott III*, 576 F. Supp. 2d at 46 (citing *In re O'Farrell*, 853 F.2d 894, 895–99 (Fed. Cir. 1988)).

[2] In 2013, the United States switched to a "first to file" system.  *See* 35 U.S.C. § 102; *see also* Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011).

*Hyatt v. Boone*, 146 F.3d 1348, 1351 (Fed. Cir. 1998) (quoting version of 35 U.S.C. § 102(g) prior to 2011 amendment; other citations omitted).

The parties,[3] working independently, submitted their first patent applications for TBP-II in foreign countries just nine days apart. Abbott filed application P39 15 072 on May 9, 1989 ("072 Application") in Germany, while Yeda filed application No. 90,339 ("339 Application") on May 18, 1989, in Israel.[4] Compl. ¶¶ 8, 12. Abbott filed an additional application in Germany, P39 22 089 ("089 Application") on July 15, 1989. On May 4, 1990, Abbott filed an International Patent Application, "claiming the benefit of the filing date of [the 072 Application];" the International Patent Application was eventually designated as a U.S. Patent Application, and the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 5,344,915 ("915 Patent") to Abbott on September 6, 1994. *Id.* ¶¶ 8–10; *see also* Yeda 1st. Opp., Ex. C [Dkt. 54-4] (915 Patent).

Claiming the benefit of the 339 Application, Yeda filed U.S. Patent Application No. 07/930,443 ("443 Application") on August 19, 1992. Compl. ¶ 12; *see also* Yeda 1st Opp., Ex. D [Dkt. 54-5] (443 Application). On October 1, 1996, the Board of Patent Appeals and Interferences ("the Board") declared Interference No. 103,625 ("625 Interference") between Abbott's 915 Patent and Yeda's 443 Application. Compl. ¶ 14; *see also* Yeda 1st Opp., Ex. A [Dkt. 54-2] (Declaration of 625 Interference). "An interference is an administrative proceeding designed to determine, *inter alia*, which party was the first to invent a claimed invention and is

---

[3] Technically, the patent applications discussed here were filed by groups of scientists and companies owned the rights in the patents. At the time the patent applications were filed, predecessor companies owned the rights in the patent applications. Because none of these facts is in dispute, for the sake of efficiency, the Court will refer to the patent applications and patents as having been filed by or granted to "Yeda" or "Abbott."

[4] Yeda's predecessor in interest filed two additional applications in Israel (91229 on August 6, 1989 and 94039 on April 6, 1990).

4

therefore entitled to a patent."  Abbott Mem. Supp. Mot. Compel ("Abbott Mem.") [Dkt. 57] at

1.  In the 625 Interference, "Yeda asserted that Abbott is not entitled to the benefit of the filing

dates of either the 072 or 089 [A]pplications, because neither . . . described or enabled a protein

satisfying each limitation of the Count," which is the Board's definition of the "interfering

subject matter at issue."  Yeda 1st Opp. at 2–3.

   In the 625 Interference, Yeda prevailed.  The Board invalidated Abbott's 915

Patent and found that Abbott was not entitled to priority based on the 072 and 089 Applications

under 35 U.S.C. § 112.  *See Abbott III*, 576 F. Supp. 2d at 47.  The Board reasoned that the 072

and 089 Applications did not, "as originally filed," sufficiently describe the TBP-II protein.  *Id.*;

*see also* Yeda 1st Opp., Ex. G [Dkt. 54-8] (First 625 Interference Decision) at 19.  Abbott sought

review of the Board's decision in this Court under 35 U.S.C. § 146, in case Civil No. 00-1720.[5]

   The first district court case was assigned to the Honorable Ricardo Urbina, who

has since retired.  In 2005, Judge Urbina denied Yeda's motion for summary judgment, rejecting

its argument that Abbott's 072 and 089 Applications did not adequately describe the 915 Patent

as a matter of law.[6]  *See Abbott I* at *7.  Two years later, Judge Urbina issued an opinion

---

[5] 35 U.S.C. § 146 provides, in relevant part, that "[a]ny party to an interference dissatisfied with
the decision of the [Board] on the interference, may have remedy by civil action. . . . Such suit
may be instituted against the party in interest as shown by the records of the [USPTO] at the time
of the decision complained of, but any party in interest may become a party to the action.
. . . Judgment of the court in favor of the right of an applicant to a patent shall authorize the
Director to issue such patent on the filing in the [USPTO] of a certified copy of the judgment and
on compliance with the requirements of law."  "District court review of an interference
proceeding under Section 146 is an equitable remedy of long standing," and a Section 146 action
is "an authorized phase of the interference proceeding" before the USPTO.  *Abbott GMBH &
Co., KG v. Centocor Ortho Biotech, Inc.*, 870 F. Supp. 2d 206, 212–13 (D. Mass. 2012) (quoting
*Gen. Instrument Corp. v. Scientific–Atlanta, Inc.*, 995 F.2d 209, 214 (Fed. Cir. 1993) & *Vas-
Cath, Inc. v. Curators of the Univ. of Mo.*, 473 F.3d 1376, 1382 (Fed. Cir. 2007)).

[6] Yeda takes the position that in the first case, "the sufficiency of the 072 [A]pplication was not
at issue" because "the 089 [A]pplication disclosed more complete and correct N-terminal amino-
acid sequence information than the 072 [A]pplication, and Abbott obtained that information only

construing the 915 Patent, adopting Abbott's proposed construction, and concluding that the "[915] Patent covers only the TBP-II protein," not its "naturally occurring muteins."  *See Abbott II*, 516 F. Supp. 2d at 6.  Then, finding the evidence underlying the Board's decision in the 625 Interference "wholly unsupportive," Judge Urbina found that the Board committed clear error in invalidating the 915 Patent.  *See Abbott III*, 576 F. Supp. 2d at 51.  Judge Urbina thus granted summary judgment to Abbott and remanded the case to the Board for further proceedings.  *See* Order, Civ. No. 00-1720 (RMU) (D.D.C. Sept. 15, 2008) (ECF no. 117).  Yeda appealed to the Federal Circuit, which dismissed the appeal.  *See Abbott IV*, 333 F. App'x at 525 ("Since the district court remanded the case for the Board to determine priority, the case is not final; the issue of patentability can be reviewed on appeal from a final judgment resolving all issues.").

On remand, the Board found on December 3, 2009 that Abbott was entitled to the priority of the 089 Application.  Compl. ¶ 20.  On May 26, 2010, the Board granted judgment in the 625 Interference to Abbott, rejecting Yeda's efforts to modify the claims at issue in the Count.  *Id.* ¶ 20; *see also* Second 625 Interference Decision, Abbott Mem., Ex. B [Dkt. 57].  On September 8, 2010, Yeda filed its Complaint in the Northern District of Illinois seeking review of the second decision of the Board in the 625 Interference; the Northern District of Illinois granted Abbott's motion to transfer the case back to this District, where it was docketed as Civil No. 10-1836, before Judge Urbina.  While discovery was under way, the case was reassigned to this Court.  In this case, Yeda asserts that "the Board reversibly erred because the 072 [A]pplication failed to provide a written description under 35 U.S.C. § 112, ¶ 1 of a purified and

---

by using materials and methods that that [sic] it did not use in connection with the 072 [A]pplication."  Yeda 1st Opp. at 5.

isolated protein that satisfied all the limitations recited in and required by the Count."[7]  Yeda's

Resp. Abbott's Mem. ("Yeda 2d Opp.") [Dkt. 64] at 4.  Yeda contends that the Board erred in

concluding that the 072 Application "described 'the same proteins described in [the] 915

[P]atent'" because the "'same proteins' test cannot be reconciled with controlling Federal Circuit

law, which requires that, to benefit from an application for filing-date purposes, the application

must provide a written description of each and every limitation required by the Count."[8]  *Id.*

Yeda also asserts that the 072 Application "did not enable one of ordinary skill in the art, without

undue experimentation, to purify, isolate, or identify a protein satisfying all of the limitations

recited in and required by the Count, and it also did not disclose the Abbott applicants' best

mode."  *Id.* at 5.

   Discovery has now closed and the Court has entered a briefing schedule for cross-

motions for summary judgment.  *See* Minute Order dated May 28, 2013.  Reply briefs are due on

September 13, 2013.  *Id.*  Prior to the close of discovery, during a telephone conference on May

2, 2013, Abbott advised the Court that the parties had been unable to resolve a dispute about

whether Yeda was required to produce to Abbott two categories of documents: (1) "documents

written or reviewed by [Yeda's] testifying expert relating to certain experiments conducted in

---

[7] "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."  35 U.S.C. § 112, ¶ 1 (as effective through Sept. 15, 2012).

[8] *See In re Wallach*, 378 F.3d 1330, 1334–35 (Fed. Cir. 2004) ("Whether Appellants were in possession of the protein says nothing about whether they were in possession of the protein's amino acid sequence. . . . Until Appellants obtained the complete amino acid sequence of TBP-II, they had no more than a wish to know the identity of the DNA encoding it."); *see also Goeddel v. Sugano*, 617 F.3d 1350, 1356–57 (Fed. Cir. 2010) (reversing Board determination in interference proceeding that foreign patent application for protein satisfied 35 U.S.C. § 112, ¶ 1 because the application insufficiently described the process for producing the subject matter of the patent).

this case;" and (2) "documents relating to the financial benefit that the same testifying expert stands to gain if Yeda prevails."  Abbott Mem. at 1.  The Court directed the parties to file briefs addressing Abbott's motion to compel and held oral argument on June 5, 2013; the matter is now fully briefed and ripe for decision.

### B.  Facts Relevant to Instant Disputes

The parties' discovery disputes concern Dr. Hartmut Engelmann, one of the inventors named in Yeda's patent applications.  Dr. Engelmann is a cytokine biologist who worked as a post-doctoral fellow at the Weizmann Institute of Sciences in Rehovot, Israel.  Yeda 1st Opp., Att. [Dkt. 54-18] (Engelmann Decl.) ¶¶ 5–6.  Dr. Engelmann was part of a group of scientists that generated several patent applications and patents, including the applications for the TBT-II protein.  *Id.*   Yeda is the entity that "commercializes inventions of the Weizmann Institute."  Yeda 1st Opp., Ex. N [Dkt. 58-4] (Engelmann Jan. 16, 2012 Dep.) at 13–14.

#### 1.  The 2003 Abbott Experiments

In 2003, Abbott conducted a set of experiments to reenact its original 1989 experiments.  The facts of the 2003 experiments are mostly undisputed.  Abbott states that it performed the experiments "as part of a parallel European proceeding involving the same patent claims,"[9] Abbott Mem. at 3, although Yeda argues that "Yeda's U.S. counsel reasonably anticipated that Abbott might rely on those experiments" in the original case in this court and Abbott later did so, Yeda 2d Opp. at 5.

There were two stages to the 2003 experiments.  The first took place in Ludwigshafen, Germany, and the second took place in Abbott Park, Illinois.  During the

---

[9] Beyond acknowledging at oral argument that the European patent proceedings essentially involved the same priority dispute as the United States proceedings, neither party has been more specific about the nature of the European proceedings.

experiments, "Abbott repeated the protocol set forth in the 072 Application" in order "to demonstrate that the protocol in the 072 Application enabled a skilled artisan to isolate, purify[,] and identify the same TBP-II protein claimed in the 915 Patent." Abbott Mem. at 3 (citation omitted). Abbott "invited Yeda to designate two witnesses to observe the Abbott scientists." *Id.* Yeda retained Dr. Engelmann "as a non-testifying expert consultant" to observe the first phase in Germany and retained Dr. Menachem Rubinstein (another of the Yeda inventors) to observe the second phase in the United States. Engelmann Decl. ¶¶ 7, 10. According to Dr. Engelmann, Yeda asked him "to observe the experiments in Germany, record [his] observations and prepare a report summarizing [his] observations and opinions on the results." *Id.* ¶ 11.

During the first stage, in Germany on February 2–11, 2003, one of Abbott's scientists, Andreas Striebinger, performed the protocol in the 072 Application.[10] Engelmann Decl. ¶ 8; Abbott Mot., Ex. I [Dkt. 54-10] (Decl. of Dr. Ralph A. Bradshaw) ¶¶ 39–40. Also present were: Dr. Ralph Bradshaw, who has been designated as Abbott's testifying expert in this case; Dr. Heinz Hillen, one of the Abbott inventors named on the 915 Patent; and Dr. Engelmann, Yeda's representative. Bradshaw Decl. ¶ 40; *accord* Engelmann Decl. ¶ 8. The first phase yielded two fractions of "essentially homogenous protein," which Abbott then sent to Abbott Park "for an analysis of the N-terminal amino acid sequence using automated Edman sequencing techniques." Bradshaw Decl. ¶¶ 41, 43. In lay terms, in Germany, Abbott attempted to isolate the TBT-II protein; in the United States, it sought to determine the composition of that protein. During the first stage, Dr. Engelmann took "handwritten notes," although he "[does not]

---

[10] Specifically, Abbott repeated Example 2 of the 072 Application, which is also Example 2 of the 089 Application and the 915 Patent. Bradshaw Decl. ¶¶ 38–39; Engelmann Decl. ¶ 7. Example 2 "describes the isolation of protein from urine collected from patients with a fever in excess of 38 degrees °C." Bradshaw Decl. ¶ 38. Yeda contests Abbott's description of the tests, but that disagreement is immaterial to the discovery dispute.

remember what happened to them."  Abbott Mem., Ex. B [Dkt. 60] (Jan. 16, 2012 Engelmann

Dep.) at 73.

The second stage of the experiment took place on March 3–5, 2003, in Abbott

Park, Illinois.  Abbott scientist Dr. Thomas Holzman and his assistant, Sally Dorwin, performed

the Edman degradation.  Bradshaw Decl. ¶ 44.  Also present for the second phase were Dr.

Bradshaw for Abbott and Dr. Rubenstein for Yeda.  *Id.*; *accord* Engelmann Decl. ¶ 10.  The

parties, predictably, characterize the results of the two phases differently.  *See* Yeda 2d Opp. at

5–6 (arguing, *inter alia*, that the first phase "did not result in purification or isolation" and that

the identification of amino-acid sequences in the second phase took place outside of the presence

of Yeda representatives).

Dr. Rubenstein prepared a report for Yeda's counsel that included the data from

the second stage of the 2003 experiment.  Engelmann Decl. ¶¶ 11–12.  In preparing his report for

Yeda in 2003, Dr. Engelmann reviewed Dr. Rubenstein's report of the second stage of the

experiment, and Dr. Engelmann acknowledged having a document "somewhere" containing his

own re-analysis of the data reported by Dr. Rubenstein.  *Id.*; Jan. 16, 2012 Engelmann Dep. at

202–03 ("I did an analysis.  Prof Rubenstein's report contained the data, so I could look at the

data and re-analyze it.").  Dr. Engelmann testified that his final 2003 report was "[s]ome seven or

eight pages maybe," and he acknowledged reviewing the report prior to being deposed in this

case.  Jan. 16, 2012 Engelmann Dep. at 74.  Dr. Engelmann also stated that he "may . . . have

made" a declaration for the European proceedings about the 2003 experiment, but he was not

sure.  *Id.* at 74–75.

In "2004 or 2005," "after the observations of [the Abbott 2003] experiments," a

group from the Weizmann Institute—including Dr. Engelmann—attempted to reproduce the

Abbott 2003 experiments (and, consequently, the protocol from the 072 Application). *Id.* at 75–77.  Dr. Engelmann was unsure whether the Weizmann Institute group undertook these experiments at the request of Yeda's counsel, but he testified: "Eventually it was done at the request of the lawyers, yes." *Id.*  Dr. Engelmann acknowledged that he "did practically hands on work" and "instructed other people of how to perform certain steps." *Id.* at 77.

Dr. Engelmann was later retained as a testifying expert consultant for Yeda for this case.  Engelmann Decl. ¶ 13.  His expert report is at Exhibit L of Yeda's First Opposition, Dkt. 54-13, and his rebuttal report is at sealed Exhibit M, Dkt. 58-3.  Dr. Bradshaw has been retained as Abbott's testifying expert; his expert report and rebuttal report are together at Exhibit I to Yeda's First Opposition, Dkt. 54-10.

### 2.  The Royalty Agreement

Dr. Engelmann's testimony about the royalty agreement is at pages 154–158 of his January 16, 2012 Deposition.





*Id.* at 12–13

*Id.* at 107–08.

## II. LEGAL STANDARDS

A number of legal standards are applicable to the instant dispute, including: (1) applicable law, (2) general discovery rules, (3) required disclosures for testifying experts, (4) the work product doctrine under case law and the Federal Rules, (5) discovery for non-testifying (consultant) experts, and (6) discovery as to "dual hat" experts—*i.e.*, those who were both consultants and testifying experts in the same case.  These standards are set forth in that order as follows.

### A.  Applicable Law

"The determination of whether material is relevant in a patent case is governed by Federal Circuit law when the material relates to an issue of substantive patent law." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 96 (S.D.N.Y. 2002) (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1307 (Fed. Cir. 2001)).  However, "questions of privilege, confidentiality, and waiver are generally governed by regional circuit law." *Id.* (citations omitted).  As to choice of law and potential application of foreign law, where "privileged communications took place in a foreign country or involved foreign attorneys or proceedings," a United States court should "defer[ ] to the law of the country that has the predominant or the most direct and compelling interest in whether those communications should

remain confidential, unless that foreign law is contrary to the public policy of [the] forum."

*Astra*, 208 F.R.D. at 98 (citations and internal quotation marks omitted, alterations in original).

## B.  Discovery Generally

Parties are permitted to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense," and, "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."  Fed. R. Civ. P. 26(b)(1).  Discovery can be limited by court order if (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," (2) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action," or (3) "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(C).

## C.  Required Disclosures for Testifying Experts—Rule 26(a)(2)(B)

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), when an expert witness is "retained or specially employed to provide expert testimony in the case," the expert witness must prepare a report for disclosure to the adverse party that includes, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."  The phrase "facts or data" is a change from the pre-2010 rule, which referred to "data or other information."  *See* Fed. R. Civ. P. 26 advisory committee's note to 2010 amendments ("2010 Ad. Comm. note") (stating that the 2010 amendment is intended to "limit the expert report to facts or data (rather than 'data or other information,' as in the current rule) considered by the witness").  The Advisory Committee clarified the intent of the change:

> The refocus of disclosure on 'facts or data' is meant to limit disclosure to material of a factual nature by excluding theories or mental impressions of counsel. At the same time, *the intention is*

> that 'facts or data' be interpreted broadly to require disclosure of
> any material considered by the expert, from whatever source, that
> contains factual ingredients. The disclosure obligation extends to
> any facts or data 'considered' by the expert in forming the opinions
> to be expressed, not only those relied upon by the expert.

2010 Ad. Comm. note (emphasis added); *see also Allstate Ins. Co. v. Electrolux Home Prods.,*

*Inc.*, 840 F. Supp. 2d 1072, 1077–78 (N.D. Ill. 2012) (observing that Rule 26(a)(2)(B) "was

amended in 2010 to . . . [make] clear that disclosure of theories or mental impressions of counsel

is not required"); *Fialkowski v. Perry*, Civ. No. 11-5139, 2012 WL 2527020, at *4 (E.D. Pa. June

29, 2012) ("[T]he purpose of amending Rule 26 in 2010 was to limit disclosure to materials of a

factual nature and to protect against disclosure of counsel's work product.").

      As discussed in additional detail below, the 2010 amendment to Rule 26(a)(2)(B)

was accompanied by several other changes to the expert discovery rules governing privilege.

The 2010 amendment was, in essence, an effort to reign in courts that had held that the

disclosure requirement of Rule 26(a)(2)(B) trumped *all* claims of privilege, such as *Regional*

*Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697, 717 (6th Cir. 2006) (adopting the

"overwhelming majority" approach that "Rule 26 creates a bright-line rule mandating disclosure

of all documents, including attorney opinion work product, given to testifying experts.").  The

bright-line rule is no longer valid; attorneys' "theories or mental impressions" *are* protected, but

everything else is fair game.  *See Fialkowski*, 2012 WL 2527020, at *3 ("[R]equired disclosures

under Rule 26(a)(2)(B) [after the 2010 amendment] still include 'any information furnished to a

testifying expert that such an expert generates, reviews, reflects upon, reads, and or uses in

connection with the formulation of his opinions . . . .'" (quoting *Synthes Spine Co., L.P. v.*

*Walden*, 232 F.R.D. 460, 463 (E.D. Pa. 2005)); *accord Sara Lee Corp. v. Kraft Foods, Inc.*, 273

F.R.D. 416, 419 (N.D. Ill. 2011) (discussing intent of 2010 amendment).

14

Because the word "considered" is unchanged, cases interpreting its meaning remain valid. "For Rule 26 purposes, a testifying expert has 'considered' data or information if the expert has read or reviewed the privileged materials before or in connection with formulating his or her opinion." *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 537 (N.D. Ohio 2008) (internal citation and quotation marks omitted). "Courts have declined to adopt a definition that would necessitate an inquiry into the 'subjective mental processes' of the testifying expert," and "[m]aterials reviewed or generated by an expert must be disclosed, regardless of whether the expert actually relies on the material as a basis for his or her opinions." *Id.* (internal citations, quotation marks, and modifications omitted). "Thus, experts have been deemed to have considered materials even when they have testified, under oath, that they did not consider the materials in forming their opinions." *Id.*

### D.  Work Product Doctrine

The work product doctrine has been developed by courts, including extensively in the D.C. Circuit, and is also codified in part in the Federal Rules of Civil Procedure. Both standards are set forth here.

### 1.  D.C. Circuit Case Law

"The party who seeks work product doctrine protection is responsible for establishing applicability of the protection and that there has not been a waiver." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 288 F.R.D. 222, 225 (D.D.C. 2012) (citing *U.S. Airline Pilots Ass'n v. Pension Benefit Guar. Corp.*, 274 F.R.D. 28, 31 (D.D.C. 2011)). The work product privilege "applies to material 'obtained or prepared by an adversary's counsel' in the course of his legal duties, provided that the work was done 'with an eye toward litigation.'" *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). "Work product protection is not absolute but rather is a qualified immunity."

*Westrick*, 288 F.R.D. at 226; *see also United States v. Nobles*, 422 U.S. 225, 239 (1975) ("Like

other qualified privileges, [the work-product privilege] may be waived.").  "In reviewing

documents claimed to be protected by the work-product privilege, the court must determine

'whether, in light of the nature of the document or the factual situation in a particular case, the

document can fairly be said to have been prepared or obtained because of the prospect of

litigation.'" *F.T.C. v. Boehringer Ingelheim Pharms., Inc.*, 286 F.R.D. 101, 107 (D.D.C. 2012)

(quoting *Banks v. Office of Senate Sergeant–At–Arms*, 228 F.R.D. 24, 26 (D.D.C. 2005)); *see*

*also United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (applying the same

standard).

   Under *Hickman*, work product is subject to two different levels of protection: "To

the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely

shifts the standard presumption in favor of discovery and requires the party seeking discovery to

show 'adequate reasons' why the work product should be subject to discovery.  However, to the

extent that work product reveals the opinions, judgments, and thought processes of counsel, it

receives some higher level of protection, and a party seeking discovery must show extraordinary

justification." *In re Sealed Case*, 676 F.2d at 809–10.  In *Boehringer Ingelheim*

*Pharmaceuticals*, another judge of this Court recently summarized the two standards as follows:

> If a party can show that the documents were developed because of
> ongoing litigation, they are not discoverable absent the requesting
> party's showing that their need for the documents is substantial and
> that they are unable to obtain the substantial equivalent of the
> materials by other means without suffering "undue hardship."
> *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124
> F.3d 1304, 1307 (D.C. Cir. 1997).  Even when the requesting party
> can meet this burden, only "factual" work product will be
> disclosed; "opinion" work product, which reveals the mental
> processes or impressions of an attorney or his or her agents, will
> still receive the utmost protection.  *Upjohn Co. v. United States*,
> 449 U.S. 383, 400 (1981); *Dir., Office of Thrift Supervision*, 124

F.3d at 1307 ("Opinion work product . . . is virtually undiscoverable.").

286 F.R.D. at 107–08; *see also United States v. Clemens*, 793 F. Supp. 2d 236, 244 (D.D.C. 2011) (same). "The 'difficult matter' of deciding what 'degree of selection is necessary to transform facts into opinions' has yet to be resolved by the District of Columbia Circuit." *Clemens*, 793 F. Supp. 2d at 245 (citing *Dir., Office of Thrift Supervision*, 124 F.3d at 1308).

## 2. Federal Rules of Civil Procedure

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's . . . consultant . . . )." Fed. R. Civ. P. 26(b)(3)(A). A party can overcome the general rule protecting work product when the requested materials are (1) "otherwise discoverable under Rule 26(b)(1)" and (2) "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.* The Advisory Committee anticipated that the substantial need/undue hardship showing would only be met in the "rare case." 2010 Ad. Comm. note. In evaluating whether there is a substantial need, courts have considered factors including: "(1) [the] importance of the materials to the party seeking them for case preparation; (2) the difficulty the party will have obtaining them by other means; and (3) the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks." *MeadWestvaco Corp. v. Rexam PLC*, No. 1:10cv511(GBL/TRJ), 2011 WL 2938456, at *4 (E.D. Va. July 18, 2011).

The Federal Rules now contain express protection for communications between attorneys and testifying expert witnesses, subject to three exceptions.[11] Drafts of testifying expert reports are protected from disclosure under Rule 26(b)(4)(B), and Rule 26(b)(4)(C) now makes clear that Rule 26(b)(3) (governing work product generally) also protects "communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B) . . . except to the extent that the communications: (i) relate to compensation for the expert's study or testimony; (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed."

Rule 26(b)(4)(C) was added in 2010 "to provide work-product protection for attorney-expert communications regardless of the form of the communications, whether oral, written, electronic, or otherwise" and "to protect counsel's work product and ensure that lawyers may interact with retained experts without fear of exposing those communications to searching discovery."  2010 Ad. Comm. note.  "The protection is limited to communications between an expert witness required to provide a report under Rule 26(a)(2)(B) and the attorney for the party on whose behalf the witness will be testifying. . . . The rule does not exclude protection under other doctrines, such as privilege or independent development of the work-product doctrine"  *Id.* However, the Advisory Committee added that the addition of Rule 26(b)(4)(C) does "not impede discovery about the opinions to be offered by the expert or the development, foundation, or basis of those opinions."  *Id.*  It further stated:

---

[11] As discussed above, the 2010 Amendments respond to the post-1993 view, adopted by many courts, that Rule 26 "authorize[s] discovery of all communications between counsel and expert witnesses and all draft reports."  2010 Ad. Comm. note.  In practice, though, "routine discovery into attorney-expert communications and draft reports . . . had undesirable effects."  *Id.*

> For example, *the expert's testing of material involved in litigation, and notes of any such testing, would not be exempted from discovery by this rule*.  Similarly, inquiry about communications the expert had with anyone other than the party's counsel about the opinions expressed is unaffected by the rule.  Counsel are also free to question expert witnesses about alternative analyses, testing methods, or approaches to the issues on which they are testifying, whether or not the expert considered them in forming the opinions expressed.

*Id.* (emphasis added).

### E.  Non-testifying Expert (*i.e.*, Consultant) Protection

Non-testifying experts receive protection under two parts of amended Rule 26. First, there is the general statement in Rule 26(b)(3)(A) that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's . . . consultant . . . )." Fed. R. Civ. P. 26(b)(3)(A).  As stated above, this general rule is subject to an exception in cases where the proponent shows "substantial need" and when the requested materials or their "substantial equivalent" cannot be obtained "without undue hardship."  *Id.*

Rule 26(b)(4)(D) (former Rule 26(b)(4)(B)[12]) expressly addresses the case of non-testifying experts and sets an "even higher barrier" for discovery of their work product.  *Sara Lee*, 273 F.R.D. at 419.  Rule 26(b)(4)(D) states: "Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."  As relevant here, discovery of such facts or opinions is appropriate "on showing exceptional circumstances under which it is impracticable

---

[12] The 2010 amendments to Rule 26 did not modify present Rule 26(b)(4)(D) in any substantive way.  *See* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2032 (3d ed. & Supp.).

for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P.

26(b)(4)(D)(ii).  There are "four commonly stated policy considerations" for this rule: "(1) the

interest in allowing counsel to obtain the expert advice they need in order [to] properly evaluate

and present their clients' positions without fear . . . ; (2) the view that each side should prepare its

own case at its own expense; (3) the concern that it would be unfair to the expert to compel its

testimony and also the concern that experts might become unwilling to serve as consultants if

they suspected their testimony would be compelled; and (4) the risk of prejudice to the party who

retained the expert as a result of the mere fact of retention." *Westrick*, 288 F.R.D. at 227–28

(quoting *Long Term Capital Holdings, L.P. v. United States*, No. 01–CV–1290 (JBA), 2003 WL

21269586, at *2 (D. Conn. May 6, 2003)).

   When invoking the "exceptional circumstances" exception to discover a non-

testifying expert's work product, "the burden on the moving party is to show [exceptional]

circumstances such that it cannot get any facts or opinions on the subject in which it is

interested."  8A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*

("*FPP*") § 2032 (3d ed. & Supp.).  The "exceptional circumstances" burden is high.  *See Lowery*

*v. Circuit City Stores, Inc.*, 158 F.3d 742, 765 (4th Cir. 1998) (affirming finding that exceptional

circumstances were not shown when proponent of discovery was "able to obtain sufficient

information by other means," the consulting expert from whom discovery was sought "submitted

a detailed expert report," the proponent had its own experts that were able to challenge the

consulting expert's analysis, and the proponent was able to "thoroughly examine" the consulting

expert during his deposition), *judgment vacated on other grounds*, 527 U.S. 1031 (1999); *see*

*also Doe v. District of Columbia*, 231 F.R.D. 27, 41 (D.D.C. 2005) (no exceptional

circumstances existed when proponent had "other means" to obtain discovery because proponent

had access to consulting expert's report and underlying materials and could depose expert).

However, the burden is not so high as to be insurmountable, and "cases allowing discovery often

involve information about since-destroyed materials or situations in which the expert might also

be viewed as a fact witness regarding matters at issue." *FPP* § 2032; *see, e.g.*, *Braun v. Lorillard*

*Inc.*, 84 F.3d 230, 236 (7th Cir. 1996) (affirming grant of motion to compel because the

defendant "could not conduct its own tests on tissues that had been destroyed in the course of the

plaintiff's tests" and "[t]he only way the defense could find out whether there were crocidolite

asbestos fibers in the tissues that the plaintiff's experts had tested was to get the test results").

Courts have also found that "[e]xceptional circumstances 'may exist when a non-testifying

expert's report is used by a testifying expert as the basis for an expert opinion, or where there is

evidence of substantial collaborative work between a testifying expert and a non-testifying

expert.'" *Westrick*, 288 F.R.D. at 228 (quoting *Long Term Capital Holdings*, 2003 WL

21269586, at *2).

### F.  Dual-Hat Experts

This case presents the issue of "whether, and to what extent, the work-product

privilege applies when an expert alternately dons and doffs the 'privileged hat' of a litigation

consultant and the 'non-privileged hat' of the testifying witness.  In other words, does a litigant

forfeit the privilege that would otherwise attach to a litigation consultant's work when he offers

that expert as a testifying witness?" *SEC v. Reyes*, No. C06-04435 CRB, 2007 WL 963422, at *1

(N.D. Cal. Mar. 30, 2007); *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. 545, 546

(E.D. Mo. 2002) ("[T]he overwhelming majority of courts have taken the language of Rule 26 to

mean that providing otherwise protected materials to a testifying expert who considers them in

forming an expert opinion generally waives the protection, whether the expert actually relies on

the information or not.").  The *Reyes* court summarized the approach of courts prior to the 2010

amendments to Rule 26 as follows:

> Every court to address this "multiple hats" problem has concluded
> that an expert's proponent still may assert a privilege over such
> materials, but only over those materials generated or considered
> uniquely in the expert's role as consultant.  *B.C.F. Oil Refining,
> Inc. v. Consol. Edison Co. of New York*, 171 F.R.D. 57, 61–62
> (S.D.N.Y. 1997); *Grace A. Detwiler Trust v. Offenbecher*, 124
> F.R.D. 545, 546 (S.D.N.Y. 1989); *Beverage Mktg. Corp. v. Ogilvy
> & Mather Direct Response, Inc.*, 563 F. Supp. 1013, 1015
> (S.D.N.Y. 1983); *see also Messier v. Southbury Training Sch.*, No.
> 3:94–CV–1706, 1998 WL 422858, at *1–2 (D. Conn. June 29,
> 1988) (unpublished opinion).
>
> These courts have further concluded that the scope of the privilege
> must be narrowly construed against the expert's proponent, lest the
> privilege interfere with the goal of the disclosure requirements,
> which is to allow an adversary "to expose whatever weaknesses,
> unreliabilities, or biases might infect the opinions of testifying
> experts called by [an] adverse party." [*United States v.*] *City of
> Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995).  Thus,
> "documents having no relation to the expert's role as [a witness]
> need not be produced but . . . any ambiguity as to the role played
> by the expert when reviewing or generating documents should be
> resolved in favor of the party seeking discovery."  *B.C.F. Oil
> Refining, Inc.*, 171 F.R.D. at 62; *see also Offenbecher*, 124 F.R.D.
> at 546 (noting that documents "would become discoverable" to the
> extent that "the delineation between [the expert's] roles . . .
> become[s] blurred"); *Beverage Marketing*, 563 F. Supp. at 1014
> (noting that the privileged and non-privileged status of
> "consultant" and "witness" materials can be maintained only "if
> this delineation [is] clearly made").

*Reyes*, 2007 WL 963422, at *1–2.  In dual-hat expert cases, the term "considered" in Rule

26(a)(2)(B) should be construed expansively in favor of the party seeking discovery, and "the

courts should order disclosure when there is at least an ambiguity as to whether the materials

informed the expert's opinion.  In most instances, if the subject matter directly relates to the

opinion in the expert report, there will be at least an ambiguity as to whether the materials

informed the expert's opinion."  *Monsanto*, 214 F.R.D. at 547.

Because the 2010 amendments were intended (as relevant here) to limit discovery only with regards to certain types of attorney work product, the same approach remains valid after the amendments. That is, courts should apply the "broader discovery for testifying experts . . . to everything except 'materials generated or considered uniquely in the expert's role as consultant," being sure to avoid compelling production of any of the materials now expressly protected by Rule 26. *See Sara Lee*, 273 F.R.D. at 419–20 (quoting *Reyes*, 2007 WL 963422, at *2). At least one court has applied the exact same standards set forth in *Reyes* to a dual-hat expert after the 2010 amendments. *See Sara Lee*, 273 F.R.D. at 419–20.

### G.   Dual-Hat Expert Cases Cited by the Parties

In their briefs, the parties discuss the applicability of five dual-hat expert cases: *In re Commercial Money Center, Inc. Equipment Lease Litigation*, 248 F.R.D. 532 (N.D. Ohio 2008); *Monsanto Co. v. Aventis Cropscience*, 214 F.R.D. 545 (E.D. Mo. 2002); *Fialkowski v. Perry*, Civ. No. 11-5139, 2012 WL 2527020 (E.D. Pa. June 29, 2012); *Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 105 (W.D.N.Y. 2008); and *Sara Lee Corp. v. Kraft Foods, Inc.*, 273 F.R.D. 416, 419 (N.D. Ill. 2011). These cases provide a useful illustration of how courts apply the dual-hat expert rules and are summarized here.

In *Commercial Money Center*, a district court applied the dual-hat test to documents requested from a financial consultant who had audited business records and was later named as a testifying expert, quoting extensively from *Reyes* and other similar cases. 248 F.R.D. at 538–42. The court ordered production of the requested documents. Central to its decision was the failure of the party opposing production to demonstrate that the documents "were reviewed or generated [by the dual-hat expert] uniquely in his role as consultant" or that the documents had "no relation to the subject matter of [the expert's] report." *Id.* at 539.

In *Monsanto*, the consultant and testifying expert were two separate people.  At issue in *Monsanto* was the size of a gene that Monsanto added to its genetically modified corn product, Mon810 corn.  214 F.R.D at 545–46.  A consultant for the defendant, Aventis, tested the genes in Mon810, and Monsanto argued that Aventis's testifying expert had considered the results of the consultant's tests prior to preparing his expert report.  *Id.*  The court found that Aventis had waived work product immunity because "[t]he subject matter of [the expert's] testimony is the characteristics of Mon810 corn in light of the patents-in-suit" and the consultant's test "treat[s] the issue of whether or not Mon810 infringed Aventis's patents."  *Id.* at 548; *see also id.* at 549 (noting that the test "focus[ed] on the exact scientific findings that are central to the legal arguments the parties have advanced").  Noting the expansive definition of "considered" in Rule 26(a)(2)(B), and given the direct relevance of the consultant's test results to the expert's report, the *Monsanto* court rejected the argument that Aventis's expert did not "consider" the consultant's report.  *Id.* at 547–58.

*Fialkowski* is not a dual expert case *per se*, although its thoughtful analysis of the effect of the 2010 amendments to Rule 26 is useful.  The case involved a breach of contract claim among former partners of a law firm, and the court ordered production of spreadsheets and document analyses the plaintiff had prepared to assist her attorney in understanding the law firm's financial records.  *Id.* at *4–5.  The plaintiff's expert openly acknowledged that he had reviewed the plaintiff's materials, and the court found that the 2010 amendments did not protect the materials from disclosure because they were not "*counsel's* work product."  *Id.*

In a deceptive advertising case, the *Sara Lee* court addressed a defense expert who was "retained to testify about one of Plaintiff's advertisements and to consult, but not testify, about another."  273 F.R.D. at 417.  The court determined that the defendant need not

24

produce materials because that clearly "relate[d] solely to [the expert's] role as consultant, even taking into account the preference for disclosure when dealing with an expert who wears two hats," because the expert's work as to one advertisement was clearly discrete from his work as to the other. *Id.* at 420. Assuming *arguendo* that the materials did relate to the expert's role as a testifying expert under Rule 26(a)(2)(B), the *Sara Lee* court found that "[n]one of the communications contain[ed] facts, data, or assumptions that [the expert] could have considered in assembling his expert report," and the communications were thus all protected communications between the attorneys and expert under Rule 26(b)(4)(C). *Id.* at 420–21. The proponent did not show "substantial need" for the materials under Rule 26(b)(3)(A) because it had "examined the data and methods underlying [the] report, deposed [the expert] about the report, and retained its own expert to rebut the report." *Id.* at 421.

Similarly, in *Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 105 (W.D.N.Y. 2008), an employment discrimination case, the court found that the dual-hat expert's proffered expert testimony, regarding statistical analysis of employee data performed in 2008, was "not sufficiently related to the consultative analyses he conducted in 2003 and 2004 to require disclosure."

### III. ANALYSIS

Abbott's requests can be broken into two broad categories: (1) documents related to the 2003 experiments, and (2) Dr. Engelmann's royalty agreement with other Yeda inventors. The Court will address each in turn.

#### A. 2003 Experiment Materials

Within the category of documents reviewed or prepared by Dr. Engelmann related to the 2003 experiments, referred to generally as "the 2003 documents," Abbott seeks five groups of documents:

25

> (1) Dr. Engelmann's notes relating to the 2003 experiments, (2) Dr. Engelmann's report concerning the 2003 experiments; (3) Dr. Rubenstein's report relating to the 2003 experiments (which Dr. Engelmann reviewed); (4) all documents reflecting Dr. Engelmann's analysis of the sequencing data from the 2003 experiments; and (5) all documents relating to the experiments that Dr. Engelmann conducted or participated in involving the protocols and procedures in Abbott's patent applications.

Abbott Mem. at 10.  Yeda opposes the request in its entirety.

Abbott argues that Rule 26(a)(2)(B) requires Yeda to disclose all of these materials as "facts or data" considered by Dr. Engelmann in his role as a testifying expert. Abbott Mem. at 4–5; *see also* Abbott Reply at 3–4 (arguing that even if Dr. Engelmann were a consultant under Rule 26(b)(3)(A) in 2003, "his role in this litigation has now changed," making the earlier reports "discoverable under Rule 26(a)(2)(B) because they constitute 'facts or data' considered by a testifying expert").  Abbott relies heavily on the 2010 Advisory Committee Notes, especially the observation that an "expert's testing of material involved in litigation, and notes of any such testing, would not be exempted from discovery by this rule."  Abbott Mem. at 4–5. Abbott argues that Yeda must disclose these documents because: "(1) Dr. Engelmann 'considered' the withheld documents for purposes of Rule 26 disclosure; (2) the withheld documents consist of 'factual material' that does not contain the theories or mental impressions of counsel; and (3) the withheld documents relate to the subject matter of Dr. Engelmann's expert reports."  *Id.* at 5.

Yeda argues that Abbott's request should be denied because "(i) the reports fall squarely within the immunity from discovery provided by the attorney work-product doctrine[ ] and (ii) Yeda has not waived that immunity by having Dr. Engelmann testify about the experiments he performed in 1989 (as reflected in Yeda's 339 Application) and protein purification and isolation in general."  Yeda 1st Opp. at 1.  Yeda argues that the reports are

protected by consulting expert immunity under Fed. R. Civ. P. 26(b)(4)(D) because "Dr.

Engelmann has expressed no opinion regarding whether the 072 [A]pplication or 089

[A]pplication describe[ ] or enable[ ] a protein satisfying the limitations required by the Count,

and he will offer no such testimony at trial," making him a "non-testifying consultant 'who is not

expected to be called as a witness at trial' concerning the 2003 experiments.'"  *Id.*

   Analyzing Abbott's request requires the Court to address three issues.  First,

Abbott asserts that Yeda has not shown *ab initio* that Dr. Engelmann was ever retained as a

consultant in 2003, much less that he was retained in connection with the United States patent

litigation.  The Court rejects this argument.  The Court finds that United States law applies and

that there is a potential dual-hat expert problem because Dr. Engelmann served Yeda as a non-

testifying consultant and has been designated as a testifying expert witness.  Second, the Court

briefly addresses Yeda's argument that the documents requested by Abbott are opinion work

product that deserves absolute protection.  Third, the ultimate question is: are the documents

detailing Dr. Engelmann's 2003 experiments relevant to his expert testimony in this case?  The

answer to this third question effectively controls the ultimate ruling on Abbott's discovery

motion.

   **1.  Dr. Engelmann's Documents Were Prepared "In Anticipation of" United States Litigation, So United States Law Applies, and the Documents Are Protected Work Product Unless Yeda Has Waived the Privilege**

   As a threshold matter, Abbott contends that Yeda has not established "the factual

predicates for either the work product doctrine or the applicability of Rule 26(b)(4)(D)"—*i.e.*,

that the documents were prepared by (or at the request of) an attorney in anticipation of

litigation.  Abbott Reply at 2.  Abbott argues that "Yeda fails to provide any documentary

evidence showing that Yeda's attorneys engaged Dr. Engelmann in 2003 to serve as a consultant

in connection with either the European patent proceeding or the U.S. proceeding in this case."

*Id.* at 3.  As a corollary to this assertion—in an argument admittedly raised for the first time in its reply brief—Abbott argues that, without a firmer link between the 2003 experiments and this litigation, U.S. law may not apply to this dispute because some of the 2003 experiments took place in Europe in the context of the European patent proceedings.  Abbott asserts: "[I]f the Yeda lawyers who engaged Dr. Engelmann in 2003 were non-U.S. lawyers—or if the relevant 'litigation' was the European patent proceeding (as opposed to a U.S. proceeding)—the court would likely not even apply U.S. privilege law to Yeda's work product claims."  Abbott Reply at 3 (citing *Astra Aktiebolag v. Andrx Pharms. Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002)).

Yeda responds that, because "the consultants' reports were prepared by Drs. Engelmann and Rubenstein at the request of Yeda's counsel, with an eye toward both the proceedings in Europe and the first § 146 case before Judge Urbina in this Court," the work-product doctrine protection of Fed. R. Civ. P. 26(b)(3)(A) applies.  Yeda 1st Opp. at 14.  At oral argument, Yeda's counsel acknowledged they have no immediate ability to produce a consulting agreement between Dr. Engelmann and United States lawyers from 2003 because a different law firm represented Yeda at that time.  However, Yeda did produce documentation contemporaneous with the first district court case supporting its assertions, including e-mail correspondence among the parties' counsel discussing logistics for Yeda's experts to attend the first phase of the 2003 experiments in Ludwigshafen.  *See* Yeda Documentation, June 5, 2013 Hr'g Ex. 1.  In the e-mails sent on January 30, 2003, then-counsel for Yeda wrote: "Our expert's name is Dr. Hartmut Engelmann," and counsel for Abbott acknowledged the e-mail, providing the address for Abbott's lab and stating "Dr. Engelmann should ask for Dr. Hillen on arrival." *Id.*

The Court thus finds that Dr. Engelmann was retained as a consulting expert in connection with United States litigation in 2003.  As Yeda's documentation shows, in January 2003, immediately before the experiments in Germany that began on February 2, 2003, United States attorneys viewed Dr. Engelmann as their consultant in connection with the predecessor to this case, *Abbott v. Yeda*, Civil No. 00-1720 (RMU).  At that time, the case before Judge Urbina had been ongoing for almost three years, and it clearly implicated the validity of Abbott's 089 Application.  In the 2003 experiments, Abbott repeated Example 2 of the 072 Application, which is also Example 2 of the 089 Application and the 915 Patent.  *See* Bradshaw Decl. ¶¶ 38–39, Engelmann Decl. ¶ 7.  The validity of the 915 Patent was also at issue in the first case before Judge Urbina.  *See Abbott I* at *7, *Abbott III*, 576 F. Supp. 2d at 51 (finding that the Board committed clear error in invalidating Abbott's 915 Patent).  Yeda has noted that Abbott used the 2003 experiment results, at least indirectly, in the first district court case.  Yeda 2d Opp. at 5.  Thus, the documents that Dr. Engelmann prepared in connection with 2003 experiments (as well as those connected to Yeda's subsequent testing) "can fairly be said to have been prepared or obtained because of the prospect of litigation" that was ongoing in this court.  *See Boehringer Ingelheim Pharms.,* 286 F.R.D. at 107.  United States law thus applies.  Moreover, unless the privilege was later waived, documents prepared by Dr. Engelmann as Yeda's consultant in connection with the 2003 experiments are protected from discovery by the work product privilege.  *See id.*; Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily, a party may not . . . discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."); *see also* Fed. R. Civ. P. 26(b)(3)(A) (protecting from discovery "documents

and tangible things that are prepared in anticipation of litigation or for trial by or for another

party or its representative (including the other party's . . . consultant . . . )").

### 2. The Nature of the Work Product Protection Ascribed to the 2003 Documents

In its briefs and at oral argument, Yeda suggested that the 2010 amendments to

Rule 26 require the Court to ascribe absolute protection to the 2003 documents because they

contain "the mental impressions, opinions, and conclusions of Yeda's consultants, as informed

by Yeda's lawyers." Yeda 2d Opp. at 1. Abbott, of course, disagrees. *See* Abbott Reply at 4

(asserting that "the experimental data and factual observations of two protein chemists" cannot

"reveal the 'mental impressions of counsel'"). Although this strand of argument is by no means

the bedrock of Yeda's justification for opposing Abbott's motion to compel, the Court will

clarify briefly the effect of the 2010 amendments on expert discovery.

It is true, as Yeda observes, that portions of Rule 26 were amended in 2010 with

the goal of slightly reducing the universe of discoverable information with relation to testifying

expert witnesses. But Yeda misunderstands the amendments, which were intended to "exclud[e]

theories or mental impressions *of counsel*" from discovery, 2010 Ad. Comm. note (emphasis

added), not theories or mental impressions of *experts*. It was the disclosure of attorney-expert

communications, including *attorney* work product, that the Advisory Committee was attempting

to arrest. *See id.*; Fed. R. Civ. P. 26(b)(4)(C) (protecting from disclosure "communications

between the party's attorney and any witness required to provide a report under Rule

26(a)(2)(B)," subject to three exceptions). The higher standard of protection for which Yeda

argues would be implicated if this case involved only work performed by Dr. Engelmann as a

consulting expert. Then, Dr. Engelmann's work product would be subject to the showing of

need under case law or the Federal Rules. *See* Fed. R. Civ. P. 26(b)(3)(A), Fed. R. Civ. P.

26(b)(4)(D)(ii).  The problem that Yeda must confront is whether it *waived* the work product privilege that would otherwise be applicable to Dr. Engelmann's consulting materials when (and if) those materials became "facts or data" he "considered" as a testifying expert in this case.  This problem is unchanged by the 2010 amendments to Rule 26.

### 3.  Yeda's Designation of Dr. Engelmann as a Testifying Expert in this Case Waives the Work-Product Privilege Under the Dual-Hat Expert Doctrine

Yeda has designated Dr. Engelmann as a testifying expert, making him subject to disclosure of "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  Thus, Dr. Engelmann "alternately dons and doffs the 'privileged hat' of a litigation consultant and the 'non-privileged hat' of the testifying witness."  *Reyes*, 2007 WL 963422, at *1.

Yeda asserts that Dr. Engelmann need not disclose the 2003 documents because the 2003 experiments are simply irrelevant to the present proceeding before the Court, and the Court should thus find that the materials retain work product protection because they were "generated or considered uniquely in the expert's role as consultant."  *See id.* (citing *B.C.F. Oil Refining, Inc.*, 171 F.R.D. at 61–62).  Yeda asserts that "there is a clear distinction between Dr. Engelmann's previous role as a consultant," in which he "served as Yeda's representative at the 2003 experiments and interpreted those experiments for Yeda's counsel," "and his current role as a testifying expert," in which he explains the 1989 experiments and the lead-up to Yeda's 443 Application, as well as "multi-step chromatography procedures" generally.  Yeda 1st Opp. at 18; *see also* Yeda 2d Opp. at 16 (referring to a "clear line of demarcation").  Yeda argues that Dr. Engelmann was not designated as a testifying expert in the first district court case, "so there is no ambiguity that the documents were prepared by Drs. Engelmann and Rubenstein in their roles as

consultants," Yeda 2d Opp. at 3.  *See Reyes*, 2007 WL 963422, at *1–2 ("Thus, 'documents

having no relation to the expert's role as [a witness] need not be produced . . . .'" (quoting *B.C.F.*

*Oil Refining, Inc.*, 171 F.R.D. at 62)).

> Yeda is correct to the extent that there is a temporal line of demarcation between

the 2003 experiments and these proceedings.  The documents at issue were clearly prepared by

Dr. Engelmann in his capacity as a consultant.  However, whether time has passed is not the

pertinent inquiry; instead, the question is the extent of the *substantive* relationship between Dr.

Engelmann's two expert roles.  In so doing, "the scope of the privilege must be narrowly

construed against the expert's proponent," *Reyes*, 2007 WL 963422, at *1–2 (citing *City of*

*Torrance*, 163 F.R.D. at 593), and a court "should order disclosure when there is at least an

ambiguity as to whether the materials informed the expert's opinion," *Monsanto*, 214 F.R.D. at

547.  The presumption in favor of the party seeking discovery means that "if the subject matter

directly relates to the opinion in the expert report, there will be at least an ambiguity as to

whether the materials informed the expert's opinion," and consulting materials should be

disclosed.  *Id.*

> Abbott responds that Dr. Engelmann's expert report "disputes the conclusions of

Abbott's experts, including their conclusions that (1) the 072 Application discloses the same

TBP-II protein as the 915 Patent[,] and (2) the 072 Application sets forth a reliable and effective

protocol for isolating and purifying novel proteins."  Abbott Mem. at 4.  In Abbott's view, the

2003 documents relate to the subject matter of Dr. Engelmann's expert testimony even if he does

not expressly address the 2003 experiments because "the sole issue posed in this proceeding" is

whether "the 072 Application enable[s] (and provide[s] an adequate written description of) the

same normal TBP-II protein claimed in the 915 Patent."  *Id.* at 7–8.  Abbott contends that "[t]he

entire purpose of Abbott's 2003 experiments was to demonstrate—in the presence of Yeda's

own witnesses, including Dr. Engelmann—that the 072 Application enabled a person of ordinary

skill in the art to isolate, purify and identify the same protein claimed in the 915 Patent." *Id.* at 8.

Moreover, Abbott argues, "in their expert reports, Abbott's expert witnesses demonstrate at

length why Abbott's 2003 experiments support their conclusion that the 072 application enabled

a skilled person to isolate, purify and characterize the same protein claimed in the 915 Patent."

*Id.*  Essentially, because Dr. Engelmann is criticizing Abbott's experts' conclusion that the

protocol set forth in the 072 Application was "effective and reliable" and because the 2003

experiments were "designed to repeat every step in the very [same] protocol," the "'facts and

data' that Dr. Engelmann observed as a witness to Abbott's 2003 experiments . . . plainly relate

to the subject matter of his expert testimony."  *Id.*; *see also* Abbott Reply at 7 ("Dr. Engelmann's

observations of Abbott's 2003 experiments—in which Abbott repeated the same protocol that

Dr. Engelmann now criticizes as an expert witness in this case—are plainly relevant to his expert

testimony.").

Yeda's argument depends on the premise that, as a testifying expert, "Dr.

Engelmann is in a unique position, having actually performed the experiments disclosed in

Yeda's patent applications and patents, to explain why what he did in 1989 was not the same as

the protocol reported in the 072 [A]pplication."  Yeda 2d Opp. at 11.  Thus, according to Yeda,

the 2003 documents are "irrelevant to Dr. Engelmann's role in developing his expert opinions in

this case," which are "directed to his own 1989 experiments and protein purification and

isolation in general."  Yeda 1st Opp. at 18–19.   Yeda characterizes the subjects of Dr.

Engelmann's expert testimony in this litigation as "(1) the 1989 experiments described in Yeda's

339 [A]pplication and the reasons that he performed those experiments; and (2) complexities

associated with purifying and identifying novel proteins using multi-step chromatography protocols." *Id.* at 7 (citations omitted).[13]  "[W]hether the 072 [A]pplication is enabling has no relation to Dr. Engelmann's testimony about the experiments he did in 1989 to isolate and purify TBP-II" or to his "testimony contrasting the 072 protocol with the experiments he performed in 1989," which is "offered only in response to Abbott's expert's opinion that the protocols are the 'same basic protocol.'" *Id.* at 19.  Yeda thus contends that "Dr. Engelmann does not offer any opinion about the 089 [A]pplication," does not offer "any opinion about the 072 [A]pplication, other than commenting that the protocol he performed (as reported in the 339 [A]pplication) considerably differed from the protocol reported in the 072 [A]pplication," and does not offer "any opinion about the 2003 experiments." *Id.* at 9.  In Yeda's view, "[a]ny reference Dr. Engelmann makes to the 072 [A]pplication protocol is solely in response to the opinions of Abbott's experts who suggest that Abbott's scientists used the same basic protocol Dr. Engelmann used."  Yeda 2d Opp. at 11.

The Court finds the line of demarcation Yeda has drawn is more illusory than real.  Counsel for Yeda acknowledged at oral argument that, in a nutshell, Dr. Engelmann's expert testimony will be that the protocols Yeda performed in 1989 as a prelude to its 339 Application are divergent from the protocols described in Abbott's 072 Application.  Such testimony is consistent with the theory of Yeda's case in this § 146 proceeding, which is that the Board erred in determining that Abbott's 915 Patent is entitled to priority based on the sufficiency of the 072 and 089 Applications.  *See* Yeda 2d. Opp. at 4 (arguing that "the Board

---

[13] Specifically, according to Yeda, "[i]n his opening report, Dr. Engelmann provides background information regarding proteins and protein purification and characterization; background information regarding cellular receptors, TNF, and TNF-binding proteins; information about the level of ordinary skill in the art in 1989; and background information concerning Yeda's 339 [A]pplication."  Yeda 1st Opp. at 7.

reversibly erred because the 072 [A]pplication failed to provide a written description under 35 U.S.C. § 112, ¶ 1 of a purified and isolated protein that satisfied all the limitations recited in and required by the Count.").  But the experiments Dr. Engelmann observed and opined about in 2003 are, in fact, part of the very protocol contained in the 072 Application, as Dr. Engelmann himself acknowledges.  *See* Engelmann Decl. ¶ 7 ("I was asked by Yeda's counsel to represent Yeda by observing Abbott scientists attempt to practice the procedure described in Example 2 of Abbott's German patent applications [072 and 089] and U.S. Patent No. 5,344,915 [915 Patent].").  Moreover, Dr. Engelmann himself acknowledged reading at least his own 2003 report in preparation for his fact deposition in this case, Jan. 16, 2012 Engelmann Dep. at 74, further demonstrating that the overlap in subject matter is sufficient to justify granting Abbott's motion to compel.

   Yeda attempts to cast this case as involving purely legal disagreement with the standard applied by the Board or merely a question of the sufficiency of Yeda's own patent applications, but Yeda cannot escape the trap into which it has fallen by using Dr. Engelmann, one of its original patent inventors, as both a consultant for the 2003 experiments and as an expert witness here.  Even a man as highly educated as Dr. Engelmann cannot be expected to draw a mental line in the sand between information gleaned from a behind-the-scenes look at Abbott's process in 2003 and information he learned otherwise.  It would be impracticable to ask such a Herculean task of dual-hat experts, or even of experts generally; that is why courts eschew a subjective standard for whether a testifying expert has "considered" "facts or data," *see In re Commercial Money Center*, 248 F.R.D. at 537, and why courts construe the dual-hat expert rule in favor of the party seeking discovery, *City of Torrance*, 163 F.R.D. at 593.

The Court finds that Yeda waived the work product protection of Dr.

Engelmann's work as a consultant in this case by designating him as a testifying expert witness.

Accordingly, Abbott's motion to compel as to the documents related to the 2003 experiment will

be granted with respect to the five groups of documents Abbott seeks, subject to any attorney

work product otherwise protected by amended Rule 26.

### B. Royalty Agreement

The Court next turns to Abbott's motion to compel production of the royalty

agreement between Dr. Engelmann and other Yeda inventors.  Abbott argues that, because Dr.

Engelmann "is one of the named inventors in the Yeda patent application" and "will be testifying

as an expert witness," "the financial benefit that Dr. Engelmann will realize if Yeda were to

prevail in this litigation and commercialize a product based on the TBP-II protein . . . is relevant

to bias and credibility," and thus the royalty agreements between Dr. Engelmann and Yeda

should be produced.  Abbott Mem. at 10.  Yeda responds that Abbott's request should be denied

because "(i) it is wholly irrelevant to any issue in this case (e.g., while Yeda has challenged

Abbott's patent applications, Abbott has never challenged the sufficiency of Yeda's 339

Application or any other Yeda application); (ii) it is cumulative to evidence already provided to

Abbott about royalties; and (iii) Abbott has refused to produce any of its own similar

agreements" on relevance grounds.  Yeda 1st Opp. at 1.  Yeda also notes that the royalty

agreement "is confidential and cannot be disclosed . . . without permission of all parties to the

agreement." *Id.*

A court may "limit . . . the extent of discovery otherwise allowed" upon a

determination that the discovery sought is "(i) unreasonably cumulative or duplicative, or can be

obtained from some other source that is more convenient, less burdensome, or less expensive," if

"(ii) the party seeking discovery has had ample opportunity to obtain the information by

discovery in the action," or if "(iii) the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C).  All three of these justifications favor denying Abbott's request for the royalty agreement.  Based on the deposition excerpts Yeda has provided, Abbott has all of the information it could want about Dr. Engelmann's royalty agreement, and the royalty agreement is thus *per se* cumulative.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████ Jan. 16, 2012 Engelmann Dep. at 154–58.  ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*  Thus, Abbott knows all of the essential facts of ████████████████████████████████████████████

████████████████  Abbott stands to gain no additional leverage for cross-examination by obtaining the actual royalty agreement.  Moreover, the fact that the royalty agreement is confidential to other inventors████████████████████████████constitutes a "burden" on the other inventors and on Yeda that "outweighs [the] likely benefit" to Abbott of disclosure. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

Accordingly, Abbott's motion to compel production of the royalty agreement will be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny the motion to compel as to the royalty agreement and will grant Abbott's motion to compel as to the 2003 experiment materials:

> (1) Dr. Engelmann's notes relating to the 2003 experiments, (2) Dr. Engelmann's report concerning the 2003 experiments; (3) Dr. Rubenstein's report relating to the 2003 experiments (which Dr. Engelmann reviewed); (4) all documents reflecting Dr. Engelmann's analysis of the sequencing data from the 2003 experiments; and (5) all documents relating to the experiments that

Dr. Engelmann conducted or participated in involving the protocols and procedures in Abbott's patent applications.

A memorializing Order accompanies this Opinion.  Because the parties' briefs relied in part on materials that were filed under seal, the parties will be directed to prepare a joint proposed redacted version of this Opinion for approval and subsequent filing on the public docket.

Date: June 7, 2013                              _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge